72 U.S. 545
 18 L.Ed. 662
 5 Wall. 545
 THE BIRD OF PARADISE.
 December Term, 1866
 
 APPEAL from the Circuit Court for the Northern District of California, decreeing against a lien set up by ship-owners for freight, on libel filed against a cargo. The case was thus:
 On the 16th March, 1863, Eccles, of Liverpool, chartered at that place from Taylor & Co., owners of the ship Bird of Paradise, that vessel, to carry a cargo of coal, of which Eccles was the owner, to San Francisco, California, at a rate agreed on per ton.
 'The freight to be paid in Liverpool, on unloading and right delivery of the cargo, one-fourth in cash, one-fourth by the acceptance of Eccles, the charterer, at six months from the final sailing of the vessel, and the remainder by like bill, at three months from delivery, at charterer's office in Liverpool, of certificate of right delivery of cargo agreeably to bills of lading, or in cash, less five per cent., at freighter's option. The vessel to be addressed to the freighter's agent abroad. £500 to be advanced in cash at the port of discharge on account of the freight. The ship and her freight are bound to this venture. The penalty for non-performance of this agreement is to be the chartered freight in pounds sterling.'
 The master signed, and the freighter, Eccles, accepted, a bill of lading, in the usual form, for the cargo deliverable 'to order or assigns, he or they paying freight at the rate of _____, as per charter-party.'
 The vessel sailed from Liverpool April 16, 1863, and arrived at San Francisco on the 26th December, 1863, a voyage of eight months and ten days.
 The charterer, Eccles, paid the promised one-fourth of the freight before sailing, and gave his acceptance for the second fourth, at six months, falling due October 19, 1863, more than two months before the vessel arrived, but it was never paid, Eccles having failed in business, and remaining insolvent and a bankrupt. On the arrival at San Francisco, the £500 agreed to be advanced in cash at the port of discharge, was also paid; but the second acceptance, the one, to wit, for the residue of the freight, was not given, nor the amount paid in money.
 The amount due for unpaid freight, regarding the first or dishonored acceptance as a nullity, was thus $7050.
 The captain refused to deliver the cargo to the agents of Eccles, but kept control of it himself.
 These agents accordingly filed their libel in the District Court for the Northern District of California against the cargo, to recover possession of it; the delivery being resisted under a claim of lien for freight.
 That court considered that the claim was unfounded, and decreed accordingly, and the decree being affirmed by the Circuit Court, the correctness of such a view was now the question here on appeal.
 
 Mr. Benedict, for the appellants, owners of the vessel:
 
 I. This is an unconscionable action. The court will make all reasonable presumptions against the libellants.
 Eccles chartered the vessel to carry a cargo of coal from Liverpool to San Francisco, a voyage of more than eight months. The vessel performed the voyage in safety, at the expense of the owners, and then finding the charterer bankrupt, refused to deliver the cargo to his agents, unless the freight was paid. The agents refused to pay the freight, and they brought this extraordinary action. Having had the use of the entire ship, without expense, for more than nine months, this bankrupt charterer demands the cargo free of freight, on the sole ground that he had given a written promise to pay the freight, which he neither had performed, nor, being as he was, a bankrupt, ever would or could perform.
 A court of admiralty is a court of equity to the extent of doing justice and requiring justice; and it will, in a cause of possession, compel the libellants to do equity before it will transfer to him the possession. Freight is a most just demand.[1]
 Charter-parties are to be liberally construed.[2]
 II. The whole sum due—the entire balance of $7050—should have been paid before a delivery. The freight is a lien upon the cargo by the maritime law, and all presumptions are in favor of the lien. The ship is bound to the merchandise and the merchandise to the ship. This lien is not created by the act of the parties, but by the general maritime law, and is founded in public policy and the interest of commerce. The Kimball,[3] in this court, is full to this effect. It gives to the owner and the shipper a responsible indorser and a responsible defendant in every port of the sea. And this rule—an elementary and cardinal one—is to prevail, unless the parties have intentionally excluded it—a thing to be inferred from plain language alone. Nothing can be inferred from silence. The burden is on the shipper to prove an absolute waiver of the lien. He has given no such evidence here.
 Now, in this case, the freighter having failed—having become wholly bankrupt—there was no obligation to deliver, unless the whole amount due—we mean both that sum due on the protested draft, and that balance due after the £500 cash were paid at San Francisco—were paid in cash. There is in every contract for a payment by acceptances, when made in a case like this, a condition not the less fundamental because but implied—that the acceptor shall be solvent. This condition the law adds to the contract.
 1. By the terms of the agreement, the giving an acceptance was 'non-performance' if it were not paid. It fell due before the end of the voyage, and not being paid at maturity, Eccles failed to perform his part of the contract. Moreover his bankruptcy demonstrated that he never could perform it.
 2. So, too, the charter-party declares in substance, 'We have received your cargo, and it will be delivered to you if you pay as agreed in the charter-party. If you do not 'pay' it will not be delivered. We shall not deliver on dishonored acceptances—they are not payment.'
 3. So, finally, by the now prevailing rules of commercial law, the rule at this day being, that a mere note or draft does not amount to a payment of a debt.[4] Certainly, in cases of sales of goods conditionally, as for cash or indorsed paper, and the cash not paid or the notes not given and the property delivered the delivery is conditional, if the intent of either party that it should be so can be at all inferred from their acts and the circumstances of the case.[5]
 In a case very similar to this in New York, Comstock, J., said:
 
 
 1
 'The analogies to be derived from the law of stoppage in transitu are perhaps not perfect, but they are sufficiently near to furnish a rule for the present case. When goods are sold to be paid for in the notes of the buyer, and he becomes insolvent before the delivery is complete, the seller may arrest the delivery and rescind the sale. There is nowhere in the terms of the contract any such condition. The law implies it, because the assumed ability of the buyer to pay for the goods was the inducement to the sale.'
 
 
 2
 But in this case we have the very terms of the contract. The charterer had failed to perform the charter-party on his part by not having paid his acceptance for the one-fourth. There was thus 'non-performance' of the agreement; and, by the terms of the contract, 'the penalty for non-performance of this agreement is to be the chartered freight in pounds sterling.' That is to say, in cash on delivery.
 
 
 3
 There were also in this case circumstances which aid in the construction of the contract. This, it must be remembered, was the longest voyage known to commerce, ending many thousands of miles from the parties; no security except the cargo; the cargo homogeneous, of great value and ready sale; the taking the bill of lading in addition to the charter-party; the making the acceptances fall due before the end of the voyage, so that, if not paid, the charterer would violate the charter-party and the master be entitled to enforce his lien for the whole freight by the bill of lading, and the improbability that any ship-owner would despatch his ship on such a voyage with no possible security for any freight: all these coincide with those provisions of the contract which provide for the usual lien.
 
 
 4
 III. But if this were not true as to the whole amount conceding that as to the second instalment the language of the charter-party ('the remainder by like bill at three months from delivery, at charterer's office in Liverpool, of certificate of right delivery') may place, as to that balance, the risk of solvency on the ship-owners—yet certainly as to the quarter for which the draft was given and not paid, the case is different. There has assuredly been no payment of that fourth; while payment of it was a condition precedent to delivery. In any view, by the terms of the contract, as well as by the now prevailing rule of commercial law, the giving of a worthless draft was no payment.
 
 
 Messrs. Owen and Nash, contra:
 
 
 5
 I. The provisions of the charter-party are inconsistent with any lien upon the cargo for the freight.
 
 
 6
 The freight was to be paid at Liverpool, the port of loading, not at San Francisco, the port of discharge. A payment to the master at San Francisco, therefore, would not protect the party making such payment. The freight was to be paid not concurrently with the delivery of the cargo, but partly in advance and partly three months after such delivery: 'One-fourth in cash and one-fourth by charterer's acceptance at six months from the final sailing of the vessel.' These payments were to be made in advance of any freight being earned, in consideration therefore not of having carried, but simply of agreeing to carry and of taking the cargo on board. 'The remainder, by like bill, at three months from date of delivery, at charterer's office in Liverpool, of the certificate of the right delivery of the cargo.' This portion was, therefore, payable also in Liverpool, and not payable there till a certificate should be produced at the charterer's office in Liverpool, that the cargo had been duly delivered in San Francisco, and then payable by bill at three months, or in cash, at charterer's option.
 
 
 7
 It is impossible to sustain a lien as for freight, under a special contract of this character, without disregarding the whole current of authority.[6]
 
 
 8
 The lien exists only where the master has a right to demand the freight on unlading the cargo, or where the freight is payable so soon after the cargo is discharged as to imply a right in the master to detain for that short period; as in the case of The Kimball, in this court, relied on by opposite counsel, where the freight was payable, 'one-half in five, and one-half in ten days after discharge' of the cargo. There a distinction was drawn between a discharge of the cargo and the delivery of it, the period allowed being held 'only a reasonable one for examining the condition of the cargo.'
 
 
 9
 In the case at bar, however, the credit given was so long, and the provisions of the charter-party in reference to place of payment so inconsistent with any lien, as to make it quite clear that the contract was made upon the personal responsibility of the charterer and the consideration of the cash received in advance.
 
 
 10
 II. But the right of lien does not depend upon the solvency of the charterer. In fact, the lien is of importance to the owner only, as his remedies against the charterer are precarious. Accordingly, the cases on the subject are cases where the charterer was in default. In Raymond v. Tyson,[7] there was a large arrear of charter-money. In The Kimball, the charterers had become insolvent, and though the lien was sustained, it was not on this ground. In Alsager v. The St. Katherine's Dock Co.,[8] the charterers were bankrupt, and the suit for the cargo was brought by their assignees, who were allowed to recover without paying freight. In Tamvaco v. Simpson,[9] the acceptor for a portion of the freight in advance had become bankrupt.
 
 
 11
 The question whether there is a lien or not, depending as it does upon the charter containing terms as to payment, showing a credit given to the charterer inconsistent with a lien, must be determined by the charter itself, not by circumstances subsequently occurring. If, in fact, the owner has agreed to carry the cargo, without retaining a lien upon it, but looking to the personal responsibility of the charterers, whom he has agreed to trust for the freight, the charterer may sell the cargo in transit, as being free from freight, and his subsequent insolvency cannot charge it with a lien.
 
 
 12
 III. The common provision in a charter-party, binding the cargo to the ship and the ship to the cargo, is sometimes taken into consideration in determining whether the ship-owner intended to waive his lien for freight. It was so in The Kimball, cited on the other side. In this case, in lieu of such usual clause, the charter only binds the vessel and her freight, and does not bind the cargo. This unusual language is quite consistent with the provisions as to the time, manner, and place prescribed for the payment of the freight, which it is impossible to reconcile with any right to detain the cargo.
 
 
 13
 Mr. Justice CLIFFORD delivered the opinion of the court.
 
 
 14
 Assignees of the charter-party and of the bill of lading libelled the ship Bird of Paradise, her tackle, apparel, and furniture in a cause of contract, civil and maritime.
 
 
 15
 Breach of contract alleged in the libel is the refusal of the master of the ship to deliver the cargo as stipulated in the charter-party and bill of lading. Voyage was from Liverpool to San Francisco, and the cargo consisted of nine hundred and fifty-two tons of coal. Terms of the charter-party, material to the inquiry are, that the freight shall 'be paid in Liverpool on unloading and right delivery of the cargo,' at the rate therein prescribed, and in full of all other specified charges. 'Such freight is to be paid, say one-fourth in cash, and one-fourth by charterer's acceptance at six months from the final sailing of the vessel, . . . and the remainder by like bill at three months from date of delivery, at charterer's office in Liverpool, of the certificate of the right delivery of the cargo agreeably to bill of lading, or in cash under discount at five per cent. per annum, at freighter's option.' Other material clauses are, that the 'vessel shall' be addressed to the freighter's agent abroad, that five hundred pounds sterling shall 'be advanced in cash at port of discharge on account of the freight,' and that 'the ship and her freight are bound to this venture,' but it does not contain the usual clause that the cargo is bound to the ship. Bill of lading is in the usual form and contains the clause, 'they paying freight for the goods at the rate as per charter-party.' Sum advanced for first instalment of freight was subject to three months' interest, at five per cent. per annum, and cost of insurance. Charter-party was signed by the claimants, and the bill of lading was signed by the master. Ship was loaded by the charterer, and it is proved she arrived in safety at the port of destination with the cargo on board. Consignees demanded the goods, but the master refused to deliver the same unless the freight was paid contemporaneously with the delivery, placing the refusal upon the ground that the ship had a lien upon the cargo for the unpaid balance of the freight, but the libellants claimed that they were entitled to the delivery of the cargo without paying any freight except in the manner provided in the charter-party.
 
 
 16
 1. Proofs showed that the ship sailed on the sixteenth day of April, 1863, and that she arrived at the port of destination on the twenty-sixth day of December in the same year. Cash instalment of freight was paid as stipulated in the charter-party. Acceptance of the charterer given for the second instalment, payable in six months from date, was delivered to the claimants on the day the ship sailed from the port of departure. Before she arrived at the port of destination, the charterer failed in business, and became and is insolvent and bankrupt.
 
 
 17
 Payment of the acceptance was never made, and the proofs show that it is still held and owned by the claimants. Whole freight remains unpaid except the cash instalment paid before the ship sailed, and the five hundred pounds stipulated to be advanced in cash at the port of discharge. Amount due and unpaid is seven thousand and fifty dollars in gold, deducting the sum advanced at the port of discharge and including the residue of the last instalment and the unpaid and protested acceptance. Pending the suit, the cargo was delivered to the consignees under a stipulation that it should be returned to the master in case the claim of lien for freight should be sustained. Decree of the District Court was that the claim was unfounded; that the ship had no lien for freight on the cargo, and that the stipulation for the return of the cargo should be given up to be cancelled. Circuit Court affirmed the decree, and the claimants appealed to this court.
 
 
 18
 2. Equities of the case in view of the whole record are strongly with the ship-owner, but the questions presented for decision are questions of law and must depend upon the construction of the contract as expressed in the charter-party. Reference need not be made to the bill of lading, as it is in the usual form, and refers to the charter-party as the controlling evidence of the contract in respect to the matter involved in this controversy. Ship-owners, unquestionably, as a general rule, have a lien upon the cargo for the freight, and consequently may retain the goods after the arrival of the ship at the port of destination until the payment is made, unless there is some stipulation in the charter-party or bill of lading inconsistent with such right of retention, and which displaces the lien.
 
 
 19
 3. Such a lien is regarded in the jurisprudence of the United States as a maritime lien, because it arises from the usages of commerce, independently of the agreement of the parties, and not from any statutory regulations. Legal effect of such a lien is, that the ship-owner, as carrier by water, may retain the goods until the freight is paid, or he may enforce the same by a proceeding in rem in the District Court. But it is not the same as the privileged claim of the civil law, nor is it an hypothecation of the cargo which will remain a charge upon the goods after the ship-owner has parted unconditionally with the possession. Although the lien is maritime and cognizable in the admiralty, yet it stands upon the same ground with the lien of the carrier on land, and arises from the right of the ship-owner to retain the possession of the goods until the freight is paid, and is lost by an unconditional delivery to the consignee.[10]
 
 
 20
 Parties, however, may frame their contract of affreightment as they please, and of course may employ words to affirm the existence of the maritime lien, or to extend or modify it, or they may so frame their contract as to exclude it altogether. They may agree that the goods, when the ship arrives at the port of destination, shall be deposited in the warehouse of the consignee or owner, and that the transfer and deposit shall not be regarded as the waiver of the lien; and where they so agree, the settled rule in this court is, that the law will uphold the agreement and support the lien.[11]
 
 
 21
 4. Presumption is in favor of the lien as already explained, but it may be modified, or it may be excluded or displaced by direct words, or by the insertion of some stipulation wholly incompatible or irreconcilable with the existence of such a right. Contracts of affreightment, like other commercial contracts, where the language employed is ambiguous or of doubtful meaning, are subject to judicial construction, and it often happens that the terms of the instrument in respect to the payment of freight and the delivery of the cargo are so inaptly chosen that it gives rise to very close and embarrassing questions. Where the stipulation is, that the goods are to be delivered at the port of discharge before the freight is paid, without any condition or qualification, it seems to be agreed that the lien of the ship-owner for the payment of the freight is waived and lost, as the right of lien is inseparably associated with the possession of the goods. Unless the stipulation is, that the delivery shall precede the payment of the freight, and the language employed as applied to the subject-matter and the surrounding circumstances is such as clearly to show that the change of possession is to be absolute and unconditional, the lien is not displaced, as the presumption of law is the other way, which is never to be regarded as controlled, except in cases where the language employed in the instrument satisfactorily indicates that such is the intention of the parties.
 
 
 22
 5. Such precedent delivery, if absolute and unconditional, displaces the lien for freight, because it is repugnant to it and incompatible with it, but where the payment or security of payment is to be concurrent or simultaneous with the delivery of the cargo the lien exists in full force, and the ship-owner cannot be required to make the delivery until the payment of freight, or security, as the case may be, is tendered. Judge Story says the lien exists if it appears that the payment is to be made before or at the delivery of the cargo, or even if it does not appear that the delivery is to precede such payment.—(The Volunteer, 1 Sumner C. C. 571.) Accordingly, he held in that case, that the stipulation that the freight should be paid within ten days after the vessel returned to the port of departure, did not displace the lien on the return cargo, as the unlivery of the cargo might be rightfully postponed beyond the ten days after the return of the ship, when, by the terms of the charter-party, the freight would become due. Same defence, that is, the waiver or displacement of the lien by a clause in the charter-party giving credit for the payment of the freight, was set up in a subsequent case before the same court, in which the terms of the clause relied on afforded more color to the views of the respondent.[12]
 
 
 23
 Terms of the stipulation in that case were, that the freight should be paid 'in five days after the vessel's return to, and discharge in, the return port of the voyage.' Argument of the respondent was, that the word discharge, as used in the clause, meant not merely the unloading of the brig, but the delivery of the cargo to the charterer or owner of the goods. Aided, however, by the terms of the bill of lading, which referred to the charter-party, the court came to the opposite conclusion, and held that the word discharge, as there used, meant merely the unlading of the cargo from the ship, without any reference to a delivery to the owner or consignee. Exactly the same rule was adopted and applied by this court in the construction of a similar clause of a charter-party in a case heard and decided at the last term.
 
 
 24
 Part of the charter-money, in that case, was agreed to be paid, and was paid, before the ship sailed, or during the voyage, and the stipulation was, that the balance should be paid, 'one-half in five and one-half in ten days after the discharge of the homeward cargo,' and the decision was, that the stipulation, construed in the light of another clause in the same instrument, which provided in effect that the ship should be bound to the merchandise and the merchandise to the ship, was not inconsistent with the right of the owner to retain the cargo for the preservation of the lien, as the clause was intended for the benefit of the charterer, giving him time to examine the goods and ascertain their condition, and to decide whether he would or would not take them and pay the freight. But the court remarked that the credit might be for so great a period as to justify the inference that the ship-owner intended to waive his right of lien; and it was decided, in an earlier case, that the lien may be waived without express words to that effect, if the charter-party contains stipulations inconsistent with the exercise of such a right, or where it clearly appears that the ship-owner meant to trust to the personal responsibility of the charterer.[13]
 
 
 25
 6. Repeated decisions of the courts in Westminster Hall have adopted the same general rule, and in some decisions of very recent date the same principles have been applied in cases entirely analogous to the one now before the court. Settled doctrine of those courts is, that the law merchant gives to the ship a lien for the freight, or rather the right of the ship-owner to retain the goods until the freight is paid.[14] They hold it to be a common law right, not cognizable in the admiralty; but they admit that special clauses in the charter-party, or bill of lading, inconsistent with it, operates as a waiver, and may destroy the right.[15]
 
 
 26
 Unless, however, the special agreement is absolutely inconsistent with the retention of the goods, the waiver or displacement is not shown, and the right remains.[16]
 
 
 27
 Recent decisions in that country put the principal question under consideration in a clear light, and leave no doubt, if the case were pending there, how it would be solved. Take, for example, the case of Alsager v. Dock Co.,[17] which was decided in the Court of Exchequer. Charter-party in that case contained two clauses material to be noticed. First clause was, that the vessel might discharge in any dock the shipper might appoint, 'on being paid freight' at the prescribed rate per ton. Second clause was, that the freight should be paid 'on unloading and right delivery of the cargo, two months after the vessel's inward report at the customhouse.' Conclusion of the court was, that the two clauses of the charter-party must be construed together; but they held that the freight was not payable until two months after the inward report, and that the ship-owner had not any lien on the cargo for the freight, because the delivery of the goods was required to precede the payment of the charter-money.
 
 
 28
 Terms of the charter-party in the case of Foster v. Colby,[18] were substantially the same, so far as respects the principal question in this case. Freight was payable in that charter-party in three instalments, but the terms of the first two payments are unimportant. Material clause reads as follows, to wit: 'The remainder in cash, two months from the vessel's report inwards, and after right delivery of the cargo, or under discount at five per cent. per annum, at freighter's option.' Held, that the charter-party did not create any lien in respect of that part of the freight which was payable two months after the vessel's inward report, although the charter-party contained the stipulation that the owners of the ship should 'have an absolute lien on the cargo for all freight, dead freight, and demurrage.' Latter clause was intended, as the court held, not to enlarge the right of lien for freight, as generally understood, but to include dead freight and demurrage within the operation of the general provision.
 
 
 29
 7. Words of the charter-party in this case are that the third instalment shall be paid by 'bill, at three months from date of delivery at charterer's office, in Liverpool, of the certificate of the right delivery of the cargo, agreeably to the bills of lading.' Giving the usual meaning to language, it is plain that the intent of the parties was that the delivery of the goods should precede the payment of the freight, and it is equally clear that the delivery was to be without qualification and unconditional. Certificate of right delivery of the cargo could not be obtained until the vessel was discharged, and the cargo delivered, and, if forwarded by the next steamer, a month would elapse before it could be delivered at charterer's office in Liverpool, which would extend the credit to four months from the delivery of the cargo.
 
 
 30
 8. Appellants contend that, inasmuch as the charterer failed in business and became a bankrupt before the vessel arrived at the port of discharge, the case is taken out of the operation of those rules of law, even in respect to the last instalment. Basis of this argument is a supposed analogy between the ship-owner as against the shipper, and the vendor of merchandise as against the vendee, as exemplified in the law of stoppage in transitu, but it is not perceived that any such relation exists between the ship-owner and the charterer, or that there is any foundation whatever for the argument. Intention of the parties in the contract of affreightment, as in other commercial contracts, must be ascertained from the language employed, the subject-matter, and the surrounding circumstances, and it is clear that the question of construction cannot be affected in the smallest degree by the subsequent solvency or insolvency of one of the contracting parties. Credit was given in this case to the charterer for the payment of the last instalment of the freight of four months from the time when the goods were required by the terms of the instrument to be delivered to the consignee at the port of discharge, and it is too plain for argument that the subsequent insolvency of the charterer can neither erase that clause from the charter-party or shorten the term of the credit.[19]
 
 
 31
 Insolvency of shipper occurring while the goods are in transit, or before they are delivered, will not absolve the carrier from his agreement as made, nor authorize him to retain the goods until the freight is paid, unless the lien exists independently of that occurrence.[20]
 
 
 32
 9. Claim of the appellants, also, is that the ship in this case had a lien for the second instalment of the freight, secured by the charterer's acceptance, made payable in six months from date, and delivered to the ship-owner on the day the ship sailed. Acceptance became due, and the charterer also became a bankrupt before the vessel arrived at the port of discharge, and it is admitted that the acceptance is still held and owned by the ship-owner.
 
 
 33
 Established rule in this court is, that a bill of exchange or promissory note given for a precedent debt does not extinguish the debt or operate as payment of the same, unless such was the express agreement of the parties. Agreement of the parties filed in the case and made a part of the record, shows that the acceptance was presented to the bankrupt court, and that it has never been paid, and it is not pretended that it is of any value. Valueless as the acceptance is, the objection if made, that it had never been tendered to be cancelled, would be a mere technicality, but no such objection is made, and as the parties agree that it has never been negotiated it must be understood that any such objection is waived. Payment of that instalment of the freight therefore is not proved, and there is no evidence in the record tending to show that the lien for that instalment of the freight was ever waived. Ship-owner under the circumstances has a right to stand upon the original contract and to seek his remedy to that extent of his claim in the form to which it originally belonged as fully as if the acceptance had never been given.[21]
 
 
 34
 Entire freight under this charter-party, except the small advance stipulated to be made at the port of discharge, was to be paid in the port of shipment. Port of shipment was also the port where the ship lay when the contract was made, and the terms of the contract afford the most plenary evidence that the parties regarded the charter-money stipulated to be paid at that port as freight in the usual and proper sense in which that word is understood in the maritime law.[22]
 
 
 35
 10. Suppose, however, a different rule could be applied to the sum actually paid or advanced before the vessel sailed. Still that concession, if made, would not affect the question as to the second instalment in this case, because that instalment was not advanced in money, and has never been paid. Separated from the acceptance, which, under the decisions of this court, was not payment, it presents the ordinary case of a promise to pay freight and a failure to fulfil the contract, and in this point of view the case is clearly distinguishable from the decision in which it is held that sums stipulated in charter-parties to be paid in advance and not dependent on the carrier's contract do not have the incidents of freight, and are not protected by the lien of the ship-owner, unless by usage or special contract.[23]
 
 
 36
 11. Foundation of those decisions is, that money advanced as freight cannot be recovered back, not even in case the ship is lost on the voyage, and the freight is never earned; because, as it is said, payment determines the lien, and anything accepted as an advance, such as a bill of exchange, is the same thing, unless there is an express agreement to the contrary. Undoubtedly an actual payment determines the lien to that extent, but it is not correct to say that a bill of exchange has the same effect, unless it be so agreed between the parties; and the settled doctrine in this country is, that freight paid in advance is not earned unless the voyage is performed, and that the shipper may recover it back, if for any fault not imputable to him the contract is not fulfilled.[24]
 
 
 37
 12. Absence of the clause that the merchandise is bound to the ship cannot affect the question, as that is the presumption of the law-merchant, from the relation between the ship and the cargo, independently of any express stipulation, unless the presumption to that effect is negatived by the language of the contract.[25] Whenever the owners of the ship constitute one party, and the owners of the cargo the other, the law of freight applies, and the fundamental rule, says Mr. Parsons, is that the rights of the respective parties are reciprocal, and that each has a lien against the other to enforce those rights, and the better opinion is, that the lien for freight commences as soon as the goods are delivered into the control of the master, or certainly as soon as they are put on board.[26]
 
 
 38
 Usually the charter-party contains a clause binding the ship to the merchandise and the merchandise to the ship, but the law-merchant, as already explained, imposes that mutual obligation even if it be omitted.[27]
 
 
 39
 Decree of the Circuit Court must be reversed with costs, and the cause remanded for further proceedings in conformity to this opinion. Libellants, upon the payment of the amount of the protested acceptance and interest and costs of suit, will be entitled to a decree that the stipulation given for the return of the goods shall be given up to be cancelled. Otherwise the libel must be dismissed.
 
 
 40
 DECREE REVERSED WITH COSTS.
 
 
 
 [1]
 Minerva, 1 Haggard, 357; The Trident, 1 W. Robinson, 35; Id. 192.
 
 
 [2]
 Raymond v. Tyson, 17 Howard, 59.
 
 
 [3]
 3 Wallace, 42.
 
 
 [4]
 Sutton v. The Albatross, 2 Wallace, Jr., 327.
 
 
 [5]
 Benedict v. Field, 16 New York, 598.
 
 
 [6]
 Raymond v. Tyson, 17 Howard, 53; Chandler v. Belden, 18 Johnson, 157; The Schooner Volunteer, 1 Sumner, 551; Certain Logs of Mahogany, 2 Id. 589; Ruggles v. Bucknor, 1 Paine, 358; Pinney v. Wells, 10 Connecticut, 104; Alsager v. The St. Katherine's Dock Company, 14 Meeson & Welsby, 794; Foster v. Colby, 3 Hurlstone & Norman, 705; Kirchner v. Venue, 12 Moore's Privy Council, 361; Tamvaco v. Simpson, 19 Common Bench, N. S. 453; affirmed, 1 Law reporter, C. P. 363.
 
 
 [7]
 17 Howard, 53.
 
 
 [8]
 14 Meeson & Welsby, 794.
 
 
 [9]
 19 Common Bench, N. S. 453.
 
 
 [10]
 1 Black, 113.
 
 
 [11]
 Mordecai v. Lindsay (The Eddy,—REP.), supra, p. 481.
 
 
 [12]
 Certain Logs of Mahogany, 2 Sumner, 600.
 
 
 [13]
 The Kimball, 3 Wallace, 42; Raymond v. Tyson, 17 Howard, 59.
 
 
 [14]
 Philips v. Rodie, 15 East, 554.
 
 
 [15]
 Lucas v. Nockells, 4 Bingham, 731; Chase v. Westmore, 5 Maule & Selwyn, 180; Tate v. Meek, 8 Taunton, 280; Horncastle v. Farran, 3 Barnewall & Alderson, 497; Small v. Moaltes, 9 Bingham, 588.
 
 
 [16]
 Crawshay v. Homfray, 4 Barnewall & Alderson, 50; Pinney v. Wells, 10 Connecticut, 104; Howard v. Macondray, 7 Gray, 516; Wilson v. Kymer, 1 Maule & Selwyn, 157; Neish v. Graham, 8 Ellis & Blackburne, 510; Campion v. Colvin, 3 Bingham, N. C. 26.
 
 
 [17]
 14 Meeson & Welsby, 798.
 
 
 [18]
 3 Hurlstone & Norman, 715.
 
 
 [19]
 Alsager v. Dock Co., 14 Meeson & Welsby, 798; Tamvaco v. Simpson, 1 Law Rep. C. P. 371; Same case, 19 Common Bench, N. S. 478.
 
 
 [20]
 Crawshay v. Homfray, 4 Barnewall & Alderson, 50; Chandler v. Belden, 18 Johnson, 157; Fieldings v. Mills, 2 Bosworth, 498.
 
 
 [21]
 Steamer St. Lawrence, 1 Black, 533; The Kimball, 3 Wallace, 45; The Active, Olcott, Admr. 206; Bark Chusan, 2 Story, 457.
 
 
 [22]
 Gilkison v. Middleton, 2 Common Bench, N. S. 152; Neish v. Graham, 8 Ellis & Blackburne 610; Gracie v. Palmer, 8 Wheaton, 605.
 
 
 [23]
 How v. Kirchner, 11 Moore's Privy Council, 21; Kirchner v. Venus, 12 Id. 384; Maclachlan on Shipping, 383.
 
 
 [24]
 The Kimball, 3 Wallace, 44; Benner v. Insurance Company, 6 Allen, 222; Chase v. Insurance Company, 9 Id. 313; Watson v. Duykinck, 3 Johnson, 335; Griggs v. Austin, 3 Pickering, 20; 3 Kent Com. (11th ed.), 304; Pitman v. Hooper, 3 Sumner, 66.
 
 
 [25]
 1 Parsons's M. L. 124, 253.
 
 
 [26]
 Parsons on Contracts (5th ed.), 286; Abbott on Shipping, 462; Fragano v. Long, 4 Barnewall and Creswell, 219; Cooke v. Wilson, 1 Common Bench, N. S. 153; Maclachlan on Shipping, 353; Tindall v. Taylor, 4 Ellis & Blackburn, 219; Same case, 28 English Law and Equity, 210.
 
 
 [27]
 Brig Casco, Davies, 184; 2 Parsons on Contracts, 303; 2 Parsons's M. L. 561.