THE ADDISON E. BULLARD.

ALLEN et al. v. TURNER et al.

(Circuit Court of Appeals, Fifth Circuit. April 17, 1919. Rehearing Denied June 25, 1919.)

No. 3348.

1. CONTRACTS ⬀163—CONSTRUCTION—PRINT' AND TYPEWRITING.
   When a contract is in part printed, and in part written or typewritten, the printed part is to be given the effect called for by its language, except in so far as inconsistent or incompatible with the written or typewritten part.

2. SHIPPING ⬀49(5)—FREIGHT—LIEN—CREATION BY CHARTER.
   A lien may be created by contract between the parties to a charter, not only for freight, but for dead freight, demurrage, and as many more of the usual claims of the shipowner as he may choose to name.

3. SHIPPING ⬀49(5)—FREIGHT—LIEN—STIPULATION OF CHARTER.
   Where the charter of a schooner stipulated that all freight to accrue was to be prepaid, that prepaid freight was to be considered as earned and to be irrevocable, and that the vessel had a lien for all freight, the lien was given and made enforceable for the freight from the time it was due to be prepaid, irrespective of whether the vessel had broken ground at the port of loading.

4. EVIDENCE ⬀394—PAROL EVIDENCE AFFECTING CHARTER PARTY.
   Plain terms of contract between shipowners and charterers embodied in the charter party are not subject to be modified by evidence of communications by telephone and telegraph between the charterers and ship brokers with reference to the chartering of the vessel.

5. SHIPPING ⬀44—CHARTER PARTY—RIGHTS OF CHARTERERS—COAL AS "PROVISIONS."
   Charterers of a schooner, entitled to the whole of the vessel, with the exception of necessary room for crew and storage of "provisions," sails, and cables, were not deprived of space to which they were entitled because the owners of the schooner stored on its deck in lockers 35 or 40 tons of coal to operate the donkey engine, heat the cabin, and discharge cargo.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Provision.]

6. SHIPPING ⬀58(2)—CHARTER PARTY—"DECK LOAD."
   On libel by the owners of a schooner against a cargo of lumber and timber, evidence held to support the conclusion that the timber and lumber carried on the so-called flush deck and the deck next thereunder constituted a full "deck load," within the meaning of the charter party stipulation on the subject.

Appeal from the District Court of the United States for the Northern District of Florida; William B. Sheppard, Judge.

Libel by Horace Turner, managing owner, and J. C. Bush and others, owners, of the American schooner Addison E. Bullard, against

Biddle W. Allen and Camille J. Friedrichs, doing business as Allen & Friedrichs, and the M. A. Quina Export Company. From a decree for libelants (252 Fed. 241), defendants appeal. Affirmed.

John C. Hollingsworth, of New Orleans, La., for appellants.

Scott M. Loftin, of Jacksonville, Fla., for appellees.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge. This was a libel in admiralty by the owners of the American schooner Addison E. Bullard against the cargo of timber and lumber loaded thereon at the port of Pensacola, and Allen & Friedrichs, the charterers "of the whole of said vessel (with the exception of the cabin, and the necessary room for crew and storage of provisions, sails, and cables), or necessary room for the cargo hereafter mentioned"; the thereinafter mentioned cargo being "lawful merchandise, understood no explosives to be shipped." The claim was for the amount of the charter rate of freight on 2,250 tons of cargo, and was based on the terms of a charter party by which the charterers agreed to pay the libelant—

"For the use of said vessel during the voyage aforesaid at the rate of *thirty and 00/100 dollars ($30.00) per gross ton of 2,240 pounds delivered to vessel, but charterers to pay freight or not less than 2,250 gross tons, vessel's dead weight capacity.* Freight prepaid on signing bills of lading, payable in United States currency. Prepaid freight earned, retained and irrevocable. * * * It is understood and agreed that the vessel has a lien upon the cargo for all freight, dead freight and demurrage."

The libel averred that the schooner was by the charterers loaded with a full and complete cargo of timber and lumber, that such cargo was less than 2,250 tons in weight, and that the charterers and their agents refused to pay freight at the charter rate on 2,250 tons of freight, but insisted on the master signing clean bills of lading for the cargo upon the charterers' paying a much less sum, and that the master offered and remained willing to sign bills of lading for the cargo upon the payment of freight at the charter rate on 2,250 tons. After the libel was filed, under an agreement made, the vessel accepted without prejudice an amount less than that claimed, signed bills of lading for the cargo, proceeded on the voyage, and delivered the cargo at Genoa, Italy, the destination stated in the bills of lading. It was provided in that agreement that the question of the libelant's right to the amount of the difference between what was so paid and what libelant claimed should be adjudicated in this case. The appeal is from a decree sustaining the libelant's claim.

[1-3] The claim asserted was resisted on the ground that no maritime lien arose or existed at the port of loading prior to the vessel's breaking ground. Based upon the circumstances that the charter party was partly printed and partly typewritten—the italicized part of the last above quoted provision being typewritten, the remainder of that provision being part of the printed form made use of—and upon the proposition that the typewritten part is controlling, it is contended that no lien was given for the freight agreed to be prepaid, and that

for the alleged breach of that stipulation the only remedy available to the shipowners was an action at law on the contract. This contention cannot be sustained if effect is given to the printed stipulation:

"It is understood and agreed that the vessel has a lien upon the cargo for all freight, dead freight and demurrage."

When a contract is in part printed and in part written or type-written, the printed part is to be given the effect called for by its language, except in so far as it is inconsistent or incompatible with the written or typewritten part. There is no inconsistency or incompatibility between the last-quoted provision and the typewritten part of the charter party. The stipulations to the effect that freight was to be prepaid on signing bills of lading, and that prepaid freight was to be considered as earned, and was to be retained and irrevocable, are entirely consistent with the stipulation to the effect that the vessel has a lien for all freight, dead freight and demurrage. A lien may be created by contract between the parties, not only for freight, but for dead freight, demurrage and as many more of the usual claims of the shipowner as they may choose to name. The Peer of the Realm (C. C) 19 Fed. 216. Where, as in the instant case, it is stipulated that all the freight to accrue is to be prepaid, that prepaid freight is to be considered as earned and to be irrevocable, and that the vessel has a lien for all freight, it is made clear that a lien is given and made enforceable for the freight from the time it is due to be prepaid. The language used in the charter party does not leave it in doubt that what was required to be "prepaid on signing bills of lading" was freight in the sense in which that word is understood in maritime law. The Bird of Paradise, 5 Wall. 545, 18 L. Ed. 662. Under such a contract the accrual of the lien is not postponed until the vessel breaks ground. International Paper Co. v. Schooner Gracie D. Chambers (Jan. 13, 1919) 248 U. S. 387, 39 Sup. Ct. 149, 63 L. Ed. 318; Allanwilde Transport Co. v. Vacuum Oil Co. (Jan. 13, 1919) 248 U. S. 377, 39 Sup. Ct. 147, 63 L. Ed. 312; Standard Varnish Works v. Steamship Bris (Jan. 13, 1919) 248 U. S. 392, 39 Sup. Ct. 150, 63 L. Ed. 321. As said in the opinion rendered in the last-cited case:

"The words 'prepaid freight to be considered as earned' declared a completed right and carried the power of retention without the expression of the latter."

An incident of the completed right is the power to enforce the lien given to secure it. When the vessel was loaded with a full and complete cargo, as stipulated in the charter party, the lien for the stipulated charter hire attached upon the tender of bills of lading for such cargo and the refusal of such tender by the charterers, and it was not in the power of the latter to postpone the attaching of the lien contracted for and its becoming enforceable by making it a condition of the acceptance of the tendered clean bills of lading for the cargo loaded that they be issued upon the payment of less than the stipulated charter hire. The averments of the libel showed that at the time it was filed the libelants had a lien on the cargo which was enforceable in a court of admiralty. Rulings as to the effect of

charter parties containing stipulations for the prepayment of freight, but not containing such provisions as those found in the charter party now in question to the effect that freight prepaid as stipulated is earned and irrevocable, and that the vessel has a lien upon the cargo for all freight, dead freight and demurrage, are not applicable to the facts of the instant case.

[4] The averments of the libel that the vessel was loaded with a full and complete cargo of timber and lumber were put in issue. The evidence on this issue was conflicting. It is not fairly open to dispute that a phase of it supported the averments of the libel in that regard. The trial court found that those averments were proved. The record by no means convinces us that the finding was against the preponderance of the evidence. The contract entitled the charterers to furnish a cargo of any lawful merchandise other than explosives. It was optional with them to ship heavy cargo to the extent of the vessel's dead weight capacity if the freight room not excepted or reserved would hold that much, or to ship light weight cargo, less than 2,250 tons of which would fill the freight space contracted for. They exercised the option by furnishing a cargo of timber and lumber, a considerable part of it being light weight kiln-dried lumber. It is plain that it was in view of the existence of this option that it was stipulated that the charterers were "to pay freight on not less than 2,250 gross tons, vessel's dead weight capacity." That was the stipulated compensation to be paid to the shipowners, whether the full and complete cargo shipped by the charterers did or did not amount to 2,250 gross tons. Over objections by the shipowners, the charterers introduced evidence of communications by telephone and telegraph between the charterers and shipbrokers with reference to the chartering of the vessel. That evidence was relied on to support the conclusion that the compensation to be paid was $30 per ton on the cargo furnished, and that no minimum amount of freight was stipulated for. Even if the brokers were authorized to speak for the shipowners, which was not shown, the plain terms of the contract between the parties, embodied in the charter party, are not subject to be altered or modified by such evidence. The charter party alone is to be looked to as the expression of the final understanding of the parties. Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622.

[5] The charterers raised the issue that they were deprived of cargo space to which they were entitled in consequence of coal being loaded in such space. The evidence showed that between 35 and 40 tons of coal were loaded in lockers on deck, provided for the purpose, and that that amount was necessary for the operation of the donkey engine, which was used in hoisting anchors and sails, heating the cabin and discharging cargo. The provision of the charter party, "vessel to furnish the use of the steam winches, with steam to drive them," shows that it was contemplated that some coal was to be carried. By the terms of that instrument the charterers were entitled to the whole of the vessel, "with the exception of the cabin, and the necessary room for crew and storage of provisions, sails and cables." The statement in the testimony of a witness for the charterers to the effect

that the word "provisions" included such a supply of coal as was taken on for the purposes stated was not contradicted. The word is appropriate to describe necessary stores or materials provided to enable the ship to comply with its obligations under the contract. The evidence was such as to warrant the conclusion that the storage in bunkers on deck of the amount of coal mentioned did not deprive the charterers of space to which they were entitled.

[6] In this court the appellants seek leave to amend their answer to the libel by averring that the beams supporting the topmost deck, sometimes called the flush deck, were so light as to be structurally insufficient to carry the full and complete deck load provided for by the charter party; that such defect shut the charterers out of having a full and complete load on the flush deck, thereby causing alleged damages, a recovery of which is prayed in the amendment sought. The allowance of the proposed amendment would introduce entirely new issues which were not raised in the trial court. The case was tried without any question as to the vessel being such as the charter party called for being raised by any part of the pleadings. The amendment is sought to enable the charterers to show by the evidence already adduced that the alleged lightness of the beams supporting the topmost deck constituted breaches of the charter party's stipulations as to the vessel being "tight, staunch, strong and in every way fitted for such a voyage," and as to its taking on "a full complete deck load consistent with the vessel's seaworthiness." The parties seeking the amendment do not ask to introduce additional evidence.

Waiving the question raised by the objection of the appellees to the allowance of the proposed amendment in this (the appellate) court, the matter we think properly may be disposed of on the ground that, if the new issues sought to be raised had been duly raised by the pleadings in the trial court, on the evidence adduced they could not, properly have been decided in favor of the appellants. What is called the flush deck is really the roof or top of a structure which incloses the space above the upper or main deck; the principal object of that structure being to protect from the weather cargo loaded on the deck next below the top of such structure. While it is customary to load some cargo on the so-called flush or shelter deck, we think the evidence was such as to require the conclusions that the flush or shelter deck was not the space contemplated by the stipulation as to taking on "full complete deck load consistent with the vessel's seaworthiness," and that the alleged lightness of the beams supporting such topmost deck was not a breach of the stipulation as to the vessel being "tight, staunch, strong and in every way fitted for such a voyage." Nothing in the charter party shows that the vessel was bound to receive and store on the so-called flush deck a full and complete deck load.

The evidence was such as to support the conclusion that the timber and lumber carried there and on the deck next thereunder constituted a full and complete deck load within the meaning of the charter party's stipulation on the subject. Neither the stipulation as to the vessel being "tight, staunch, strong and in every way fitted for such a voyage" nor any other provision of the charter party dealt with

the question of the cargo-carrying capacity of the topmost or flush deck. That unprotected space was not warranted to be fit for the carriage of any amount of lawful merchandise the charterers were entitled to offer. As the contract did not entitle the charterers to complain on the ground that the lightness of the beams supporting the topmost or flush deck rendered it structurally insufficient to carry a full and complete deck load, and as the evidence called for the conclusion that such a deck load as the contract contemplated was received and carried, the appellant can have no just cause to complain of a refusal to permit the proposed amendment, assuming that it is permissible to allow such an amendment in the appellate court.

For reasons above indicated, the proposed amendment is disallowed, and the decree appealed from is affirmed.