**GILBERT IMPORTED HARDWOODS, INC., and Norris Cattle Co., Inc., etc., Plaintiffs-Appellees-Cross-Appellants,**

v.

**245 PACKAGES OF GUATAMBU SQUARES, MORE OR LESS, in rem, Companhia de Navagacao Lloyd Brasileiro, in personam and the M/V ALMIRANTE GRACA ARANHA, in rem, Defendants-Appellants-Cross-Appellees.**

No. 73–3674.

United States Court of Appeals, Fifth Circuit.

Feb. 28, 1975.

# 1118

Victor T. Hudson, Mobile, Ala., Thomas B. Wheeler, James L. Wheeler, New Orleans, La., for defendants-appellants.

G. Hamp Uzzelle, III, Mobile, Ala., for plaintiffs-appellees.

Before THORNBERRY, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge:

Plaintiff-appellee A & H Lumber Sales Company [A & H][1] is a Mobile, Alabama, firm which imports and sells various sorts of South American hardwoods. Defendant-appellant Companhia de Navagacao Lloyd Brasileiro [Lloyd] is a Brazilian steamship company. In the seven years that A & H has been in operation, A & H has imported great quantities of Latin lumber, much of it in Lloyd ships. On July 18, 1972, Lloyd received a quantity of rough-cut guatambu lumber aboard its vessel M/V ALMIRANTE GRACA ARANHA at Itajaí, Brazil, for shipment to Mobile. A & H purchased the bills of lading for the lumber while the ship was en route, and when the ALMIRANTE GRACA ARANHA arrived at Mobile on August 18, 1972, A & H proffered $13,295.23 to Lloyd's agent in payment for the freight charges, as specified in the bills of lading. Lloyd contended, however, that the bills understated the amount of lumber actually carried on its vessel, and demanded that a survey of the cargo be made. This survey purported to show that the bills of lading were in fact incorrect, and Lloyd claimed an additional fee of $3,549.30.[2] When A & H refused to pay this amount, Lloyd refused to deliver 245 of the 1,081 packages of lumber. A & H then filed this suit in admiralty on September 15, 1972, asking the district court to adjudge A & H the proper owner of the disputed cargo, free of Lloyd's claim for freight; A & H also demanded compensation for certain physical deterioration allegedly suffered by the guatambu in the course of this dispute. Lloyd answered with a counterclaim against A & H for the additional freight fees. After a trial, the district court found that A & H owed Lloyd no additional fees, but found also that Lloyd was not liable for any damage to the disputed lumber. Both A & H and Lloyd appeal. We believe that the district court properly refused to hold Lloyd responsible for the damage to the cargo, but we find that the court erred in its determination that A & H paid the correct amount of freight.

## I

The origins of this dispute lie in the dissimilarity of standards for the measurement of lumber utilized by buyers and sellers on the one hand, and by shippers and carriers on the other. Buyers and sellers of lumber employ a measure called the board foot, which equals a piece of lumber one foot square and one inch thick, or any other configuration with a total volume of 144 cubic inches. When an American dealer such as A & H determines to purchase a quantity of South American hardwood, therefore, it specifies the number of board feet desired. Ocean carriers of this same lumber, however, deal in terms of the cubic meter, and their tariff schedules employ that standard in place of the board foot. At first glance, this difference in standards would seem to have little practical effect, for any dictionary conversion table will reveal that 424 board feet equal one cubic meter, so that in order to convert any quantity of board feet to cubic meters, one would merely have to divide by 424.

Unfortunately for simplicity, rough-cut lumber must be more finely cut before it can be used. The custom of the trade, therefore, is for the sawmill operator slightly to overcut the wood, by perhaps one-half an inch per foot, in order to ensure that the ultimate user has a full board foot with which to work.

1. Gilbert Imported Hardwoods, Inc. and Norris Cattle Company, Inc. are partners doing business as A & H Lumber Sales Company.

2. At trial, Lloyd amended its counterclaim to assert that A & H owed it a total of $3,875.58 in additional freight.

This arrangement makes a great deal of sense as between buyers and sellers of lumber, but carriers are not so much concerned with the ultimate use of the cargo they carry as with the amount of space that cargo occupies in their ships. The impact of the application of the hardwood industry's board foot to the very different concerns of the shipping business is amply illustrated by this case, in which A & H claims that the 189,996 board feet of guatambu evidenced by the bills of lading equal 448.103 cubic meters (189,996 divided by 424), while Lloyd measured the actual cubic dimensions of each package of lumber and claims that the disputed cargo encompasses 578.736 cubic meters. So it is that a tiny differential in each piece of lumber at the sawmill develops into a 20% difference in the entire cargo at the dock.

Soon after A & H entered the hardwood business and began to deal with Lloyd, the two firms commenced to quarrel over the proper basis for ascertaining freight rates for South American hardwood. A & H maintained that the custom of the hardwood business had always been that the proper basis for freight rates was to be found by dividing the number of board feet concerned by 424. Lloyd argued that because of the practice of overcutting, such a method of computation would force the carrier to transport a greater quantity of lumber than that for which it would be compensated. Accordingly, Lloyd and A & H regularly disputed the cargoes delivered by the one to the other. In December, 1970, the first survey of an A & H cargo was made by Lloyd, but no disparity was discovered. In March, 1971, however, another shipment was surveyed: Lloyd claimed that this survey revealed that the bills of lading understated the actual bulk of the cargo by 50%. After considerable negotiation, A & H offered to pay Lloyd $1,521.16—one-half of the alleged additional fee—in settlement of the controversy. A & H accompanied its check with a letter alleging that the settlement was conditioned on Lloyd's promise to adhere in the future to A &

H's method of computing freight. Lloyd accepted the check and did not pursue the matter, but denies that such an agreement on rate basis was ever made and states that it so informed A & H at the time. In June, 1971, another dispute arose, but A & H flatly refused to negotiate, referring to the purported March agreement; Lloyd dropped its claim, apparently on the theory that only $50 in additional freight was involved. Between June, 1971, and the beginning of the instant dispute in August, 1972, two or three other Lloyd ships delivered lumber to A & H without incident. Finally, the two parties clashed again after the commencement of this suit, and a compromise akin to that of March, 1971, was reached.

II

Lloyd argues that its tariff requires that the cargo be measured and its carriage charge computed on the overall dimensions of the individual packages of lumber, and that as a matter of law, no custom and usage can modify the tariff. A & H contends that the tariff must be interpreted in accordance with the custom and usage of the South American hardwood trade, which is to say that the volume of the cargo is to be determined by dividing the number of board feet evidenced by the bills of lading by 424, thereby ascertaining the correct number of cubic meters, the standard in which the tariff is couched. At trial, Lloyd introduced evidence tending to demonstrate that no such custom and usage existed between shippers and carriers. A & H produced several witnesses who testified that such a practice was universal in the industry, and who were of the opinion that Lloyd's recent conduct was utterly alien to their business experience. The district court held that the custom and usage urged by A & H did exist and was incorporated *sub silentio* into the tariff as it applied between A & H and Lloyd, so that the number of cubic meters of cargo to be used as the basis of the freight calculation was to be determined by dividing the number of board feet stated in the bills of lading by 424.

This resolution compelled the conclusion that A & H owed no additional freight to Lloyd.

■ The question we must address in our review of the district court's decision is whether any of the evidence of custom and usage could be utilized to interpret Lloyd's tariff. We note at the outset that a tariff is not an ordinary contract. Section 817(b) of the Federal Shipping Act, 46 U.S.C. § 801, *et seq.*, requires common carriers by water in foreign commerce, such as Lloyd, to establish, observe and enforce tariffs of reasonable rates and charges for carriage of goods by sea. Such rates, and changes therein, are subject to approval by the Federal Maritime Commission, and violations of the statute are punishable by fines of not more than $1,000 for each day that the violation continues.[3]

■■ Once a tariff is established by the carrier and approved by the Federal Maritime Commission, the tariff binds both the carrier and the shipper with the force of law. *See* Lowden v. Simonds-Shields-Lonsdale Grain Co., 1939, 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953;

---

**3.** Section 817(b) provides, in pertinent part, that:

(1) From and after ninety days following October 3, 1961 every common carrier by water in foreign commerce and every conference of such carriers shall file with the Commission and keep open to public inspection tariffs showing all the rates and charges of such carrier or conference of carriers for transportation to and from United States ports and foreign ports between all points on its own route and on any through route which has been established. Such tariffs shall plainly show the places between which freight will be carried, and shall contain the classification of freight in force, and shall also state separately such terminal or other charge, privilege, or facility under the control of the carrier or conference of carriers which is granted or allowed, and any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates, or charges, and shall include specimens of any bill of lading, contract of affreightment, or other document evidencing the transportation agreement.

. . .

(2) No change shall be made in rates, charges, classifications, rules or regulations, which results in an increase in cost to the shipper, nor shall any new or initial rate of any common carrier by water in foreign commerce or conference of such carriers be instituted, except by the publication, and filing, as aforesaid, of a new tariff or tariffs which shall become effective not earlier than thirty days after the date of publication and filing thereof with the Commission, and each such tariff or tariffs shall plainly show the changes proposed to be made in the tariff or tariffs then in force and the time when the rates, charges, classifications, rules or regulations as changed are to become effective: *Provided, however,* That the Commission may in its discretion and for good cause, allow such changes and such new or initial rates to become effective upon less than the period of thirty days herein specified. Any change in the rates, charges, or classifications, rules or regulations which results in a decreased cost to the shipper may become effective upon the publication and filing with the Commission. The term "tariff" as used in this paragraph shall include any amendment, supplement or reissue.

(3) No common carrier by water in foreign commerce or conference of such carriers shall charge or demand or collect or receive a greater or less or different compensation for the transportation of property or for any service in connection therewith than the rates which are specified in its tariffs on file with the Commission and duly published and in effect at the time; nor shall any such carrier rebate, refund, or remit in any manner or by any device any portion of the rates or charges so specified, nor extend or deny to any person any privilege or facility, except in accordance with such tariffs . . . .

(4) The Commission shall by regulations prescribe the form and manner in which the tariffs required by this section shall be published and filed; and the Commission is authorized to reject any tariff filed with it which is not in conformity with this section and with such regulations. Upon rejection by the Commission, a tariff shall be void and its use unlawful.

(5) The Commission shall disapprove any rate or charge filed by a common carrier by water in the foreign commerce of the United States or conference of carriers which, after hearing, it finds to be so unreasonably high or low as to be detrimental to the commerce of the United States.

(6) Whoever violates any provision of this section shall be subject to a civil penalty of not more than $1,000 for each day such violation continues.

Sommer Corp. v. Panama Canal Co., 5. Cir. 1973, 475 F.2d 292. The statutory policy behind the strict enforcement of federally-approved tariffs is so strong that the rate must be charged and paid regardless of mistake, inadvertance or contrary intention of the parties. Louisville & Nashville R.R. v. Maxwell, 1915, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853; St. Louis Southwestern Ry. v. Garvey Elevators, Inc., 5 Cir. 1974, 505 F.2d 625; Chicago, Burlington & Quincy R.R. v. Ready Mixed Concrete Co., 8 Cir. 1973, 487 F.2d 1263; United States v. Pan American Mail Line, Inc., S.D.N.Y.1972, 359 F.Supp. 728.[4] In a word, as Justice Brandeis said in a slightly different context, in Louisville & Nashville R.R. v. Central Iron & Coal Co., 1924, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900, 902:

> The shipment being an interstate one, the freight rate was that stated in the tariff filed with the Interstate Commerce Commission. The amount of the freight charges legally payable was determined by applying this tariff rate to the actual weight. Thus, they were fixed by law. No contract of the carrier could reduce the amount legally payable, or release from liability a shipper who had assumed an obligation to pay the charges.

### III

█ The tariff involved in this case, that of the Inter-American Freight Conference, sets the rates for carriage of guatambu lumber on the basis of the number of cubic meters carried. A & H argues that in order to understand the meaning of "cubic meter," one must consider the custom and usage of the hardwood trade, i. e., in order to determine the number of cubic meters a cargo encompasses, one must divide the number of board feet stated in the bill of lading by 424. A & H contends that such an exercise in no way offends the strict enforcement of tariff rates, and it is probably true that the universal observance of a custom and usage such as this one would afford little opportunity for discrimination by carriers. Nevertheless, three considerations bind us to the conclusion that since this particular custom and usage was not specifically incorporated into the tariff, it cannot now be heard to modify the rate basis, a most critical term of any tariff.

First, Rule 6(a) of the tariff provides that: "[a]ll cargo is to be measured on the over-all basis of the individual packages unless otherwise specified. . ." Rule 6(b) provides that "[w]eight or measurement freight rates shall be assessed on actual measurement of individual packages." These provisions of the tariff, taken in combination, suggest that the sort of custom and usage argued for by A & H would be inimical to the specific terms of the tariff. Second, section 817(b)(1) of the Shipping Act requires that all tariffs filed pursuant thereto "shall also state separately . . any rules or regulations which in anywise change, affect, or determine any part or the aggregate of such aforesaid rates, or charges . . .." Since the custom and usage posited by A & H certainly falls within the ambit of section 817(b)(1) and since such a provision nowhere appears in the tariff, it would seem that the tariff should be read specifically to exclude such a method of computing the rate basis. Finally, the regulations of the Federal Maritime Commission concerning the filing of tariffs by carriers covered by section 817(b) define "tariff" as:

> a publication containing the actual rates, charges, classifications, rules regulations, and practices of a carrier or conferences of carriers for transportation by water. For purposes of this tariff circular, the term "practices" refers to those usages, customs or modes of operation which in anywise affect, determine or change a transportation rate, charge or service provided by the carrier and, in the case of conferences, must be restricted to those practices on the part of common carriers, subject to Federal Maritime Commission approval.

---

4. Section 817(b) does provide for rectification of certain clerical and administrative errors

authorized by the basic conference agreement. 46 C.F.R. § 536.2.

This Commission regulation clearly indicates that in order for a custom or usage to affect the rate basis of a tariff, the tariff must specifically so affirm. In order for the Commission to determine whether a rate is "so unreasonably high or low as to be detrimental to the commerce of the United States," 46 U.S.C. § 817(b)(5), the Commission needs to know all of the factors which may affect that rate. The dispute arose in this case precisely because the custom and usage concerned did not appear in the tariff. In these circumstances, we conclude that the rate basis of this tariff, when viewed in conjunction with the other provisions of the tariff and when considered in the context of the relevant statutory and regulatory scheme, cannot be modified by the custom and usage relied upon by A & H. For this reason, the decree of the district court in favor of A & H on the issue of the additional freight charges must be reversed.

On remand, the district court must determine whether the survey of the disputed cargo made at Lloyd's request accurately measured the quantity actually carried by the ALMIRANTE GRACA ARANHA. If the court finds that the survey was accurate, it must then ascertain the amount of additional freight owed to Lloyd by A & H and then enter judgment for Lloyd in that sum.

■ Our resolution of this appeal indicates that Lloyd's action, pursuant to its carrier's lien, in withholding a part of the cargo consigned to A & H was justified by A & H's refusal to pay the full freight due on the lumber. *See Osaka Shosen Kaisha v. Pacific Export Lumber Co.,* 1923, 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364; *The Bird of Paradise,* 1866, 72 U.S. (5 Wall.) 545, 18 L.Ed. 662; *Beverly Hills Nat. Bank & Trust Co. v. Compania de Navegacione Almirante S.A., Panama,* 9 Cir. 1971, 437 F.2d 301, cert. denied, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed. 161. This determination, coupled with the district court's finding that A & H did not diligently pursue the means available for possessing itself of the disputed guatambu pending this litigation, compels the conclusion that the district properly refused to award A & H damages for any deterioration in the quality of the lumber while it was in Lloyd's possession.

■ In conclusion, we observe that while evidence of custom and usage is very often an invaluable device for enabling courts and juries to interpret ambiguous contracts as the makers of the contract intended, that is not to say that this tariff is susceptible to a gloss based on extra-contractual evidence. Since the rate basis of a tariff must be unambiguous in order for the tariff fully to serve its anti-discriminatory purpose, it is only when the specifications of the tariff call for timbers of custom and usage that such beams may be incorporated into the rate structure. Congress has made tariffs *strictissimi juris,* and businessmen may not make them otherwise, even with tools of hoary tradition. If A & H desires a different rule than that set out in the tariff, it must secure an appropriate amendment of that document.

Affirmed in part; reversed in part and remanded.